Good morning, Your Honors. May it please the Court, John Yang on behalf of the appellant. We would like to reserve five minutes for rebuttal. Your Honors, we are appealing this case because we believe that the District Court in granting habeas corpus had misapplied the AEDPA in a very fundamental way. Specifically, we believe that the United States Supreme Court precedent that the District Court relied upon, Crawford and Davis, do not require a granting of habeas relief by the California Supreme Court, and therefore the AEDPA does not allow the District Court to grant relief. When we look at the facts and the law that are set forth in Crawford, they are inapplicable to the facts and circumstances of this case because Crawford simply involves formal interrogation, which is completely absent in our case where it involves a 911 call and there was a lot of confusion and frankness, which really takes it out of the definition of what constitutes formal interrogation. The second case that the District Court had relied upon, which is Davis v. Washington, we believe that that case actually helps us in terms of the factors that were set forth by the Court in that case. There were four non-exhaustive factors. One is whether the caller was describing an ongoing event, and number two, whether a reasonable listener can recognize that the caller was facing an ongoing emergency, number three, whether the statements solicited were necessary to resolve the emergency, and number four, whether there was a formal interrogation. The United States Magistrate Court judge applied these four factors in the incident case, as he reasonably should have because that's all the California Supreme Court had in terms of the available United States Supreme Court precedent. Going through the factors, the United States Magistrate judge said that this statement in the 911 call was clearly not testimonial. Was there still an ongoing emergency at the time? We believe so because of the fact that there is actually an attempted killing that had been performed and the killer or the attempted killer is still out on a loose. If that was true, why was Mr. Ochoa standing in the front yard where he could have been vulnerable to a gunshot? Why didn't he go into the house and call? The record isn't really clear as to where Mr. Ochoa was standing, but nonetheless, at the time when the shooting occurred or the attempted shooting occurred, they ran into the house and then they came back out to observe. It really doesn't speak to what was in the minds of the witness because the witness was actually trying to figure out what was going on by standing out in the backyard. That perhaps may be a factor that the defendant could have argued to the jury or that perhaps could have been a factor that counsel could have argued to the court at the trial level or that perhaps could be a question that was asked by a court of appeal on direct appeal. Nonetheless, the question we have here is whether the California Supreme Court took that factor and mixed it with other factors and determined that no, we don't have a testimonial statement here. Pretty much what the California Supreme Court did was to supply the four factors that Davis had. The ongoing emergency, and I want to answer Your Honor's question, is that we really do not know what's in the minds of the caller. What we have are other facts that would suggest that the emergency was still ongoing and the fact that he was saying how, look, they're going to come back. And the facts indicate that this was an incident involving rival gang members and if the rival gang member did not complete the job, then it could very well be the case that that person could come back and try to complete the job. Really it's about objectiveness and it's about the reading of the record. If there's a reasonable reading in favor of the California Supreme Court's decision, then the AEDPA would require that habeas relief not be granted. And the other factor, the first factor that the U.S. Magistrate Court just had applied, caller describing an ongoing event, it was in fact ongoing because the caller was in fact describing how an incident had just occurred and the car was being driven around by the assailant. And he did describe, again, that the assailant could come back any time. So this was a situation where events were unfolding. The third factor were the statements elicited were necessary to resolve the emergency. If we look at the transcripts, it wasn't like the dispatcher was slowly taking his time to try to gather evidence. This was not a situation where it was a formal setting. This was a disorderly type of interrogation because there was frankness on the part of the caller. If we look at the transcript, it was basically questions and answers about who the caller was and then the description of the assailant. And also the caller was rambling on about what had happened, the shooting, about how many shots were fired. And so it seems to me that if you look at the sequence of events, there was solely an attempt by the dispatcher, at least a reasonable reading of it, solely by the dispatcher to ascertain what was going on, to ascertain the scope of the emergency, so as to enable responding officers to properly address the emergency. The identification of the appellee in this call, this 911 call, was critical to his conviction, correct? Because the other witness recanted or left town? Well, Your Honor, we believe that the other identification evidence was actually much, much stronger. We believe that this particular piece of evidence by the 911 caller was kind of roundabout, the identification evidence. He had to say, we had to rely on the nickname that was blurted out, and then we have to have an officer come in and testify as to the database, as to the infield identification cards, as to what they reflect. Whereas the other evidence that's in place was an out-of-court identification in a photographic lineup, in the quiet settings of a house, where the detective went to this particular witness's house, and this is Adam V. that we're talking about, and actually showed him a lineup, and he pointed to a particular photograph, and then thereafter he circled it. His sister was nearby, was in the house, and could hear what was being said. She actually was close enough to see him point to a photograph and circle it. She didn't testify during the trial, did he? He testified in the trial, and that's where the recantation came in. He came in and recanted everything, and of course then the prosecution would have to put on the detective's testimony regarding the out-of-court identification. And of course, our reaction is, of course he recanted. This was a gang situation, and situations involving snitches, of course, in gang culture oftentimes leads to witnesses recanting the identification that they initially offered before trial. And in fact, there was testimony in this case by the same detective who served a subpoena on Adam V. that upon being served, Adam V. says he's not going to show up, that I won't testify in court. I'm afraid. These two critical facts were submitted to the jury to explain Adam V.'s recantation. And of course, the detective himself being accused by the defense at trial of leading and suggesting the witness to circle a photograph, he testified that it would be entirely unethical for him to do so. And of course, the recantation was refuted by his own sister. And so we believe that the district court, in this respect, had clearly erred in applying the Bregg v. Abramson harmless error analysis. Thank you, Mr. Yang. You're going to save the rest of your time for rebuttal. Thank you. Thank you, sir. Good morning, Your Honors. If you'll please the court. Merrilee Marshall on behalf of Mr. Rojas. Good morning. I'd like to go backwards and address the prejudice aspect first. First of all, let's even assume that it's true that Adam did circle somebody and he circled the person that he believed was Largo, was downer from Largo. We don't know if he was circling him because he knew that was downer from Largo or because it was the person he saw at the scene. There was no way to cross-examine or get at that. The problem with the – there was also evidence introduced by the police that my client had a nickname called Winky. Only one person said that he – said his name was Downer. So even that identification is suspect, assuming it went – even if we discount the recantation. Now let's go back to the emergency aspect of it. From all accounts, from the tape itself and from the testimony of other witnesses, there was – there were no shots fired. There was an attempt to fire a gun and the gun didn't go off. Excuse me. Mr. Ochoa and Adam ran. They ran back into the house or into the backyard to a place of safety, and then they come back out and they call 911 from the front of the house, which is perfectly fine. And I don't have a big problem with the fact that they called 911 came in. The main thing is their identification. Because at the time they got to that identification, there was absolutely no emergency whatsoever. And if you look at the beginning of the tape, it's clear that Ochoa – Why do you say that? I mean, somebody had just attempted to fire a gun and was driving around in the neighborhood. Why isn't that? Well, I think like Your Honor said, you know, why wasn't he in the house? I don't know whether he was in the house or out of the house. I mean, somebody just tried to shoot at him. Well, the gun didn't go off, which helps. That's kind of a fortuity though, isn't it? Perhaps, but perhaps it was never intended to go off. These kids are, you know, whatever was going on, we don't really know. Whatever. I mean, the guy's got a gun. He's waving it around and trying to shoot it. But it was over, well over by the time that he got to the identification. How do we know that? Because you can tell by the conversation. First of all, he can't identify him. He's saying, well, he's from Largo. And the dispatcher says, well, how do you know that? He goes, well, because he yelled F the flats at me or something to that effect, which is the rival gang. And okay, so he knows he's somebody from the rival gang. He tries to give a description. The description is very vague. It's only until he gets all the way through after a long conversation, the time he sees his car coming back, the way they make it, the way the prosecution is making it sound, as if they're coming back at him. But they're not. They're on the other side of the tracks dropping off his car after they've stolen his rims. Most of the conversation is about his rims. But didn't he say they're coming back? Yeah. Before they even came back, he said they're coming back. Yeah, he saw them coming back. He saw that they weren't, like, coming at him. They were over on the other side of the tracks where they dropped the car. And the police arrived, like, within moments, and there was the car left. And whoever had stolen the car, whether it was my client or somebody else, was long gone because no one was arrested. My client wasn't arrested until two weeks later. And he's obviously talking to somebody else, which was a big factor for me. Even for the dispatcher who kept saying, ah, you know, just talk to me, just talk to me. So we don't know where he even got the information that it was logger from down, if, in fact, it was, and if, in fact, my client was. Does it matter for confrontation clause purposes for determining whether or not the confrontation clause applies? I think it certainly does because you can't cross-examine the person he was talking to that told him he was logger from down. But we're trying to make the determination as to whether the confrontation clause even applies. So why does it matter in that context to determine whether or not it meets the criterion for being within the confrontation clause? It comes within the confrontation clause at the point that he stops simply reporting the crime and makes an identification. Right. But if he's getting information from somebody else, what difference does that make in terms of determining whether or not the emergency was over? Well, what matters is, well, I believe the emergency was over, but the point I think where we're going now is whether or not, at what point, his purpose changes from reporting an emergency to trying to prosecute the person that stole his rims. And at that point, when he gets information and he gives it to the police that it's downer from Largo, he's now definitely within the confrontation clause. So if the person was still there and the other individual said, his name is Largo, would that make the emergency be over just because he was getting information from someone else, even if the person was still there with the gun? No, if the person was still there with the gun, I don't think I would be here arguing this. So it doesn't matter where he got the information from. That doesn't matter in terms of whether or not it's testimonial, does it? I can't say that it doesn't, because one of the things that we're concerned with and the reason that the confrontation clause is essential for testimonial evidence is because of reliability. And where he's getting the information from goes directly to the reliability of the information and the purpose in him giving it. If the person is standing right there, then obviously both of them should come in to testify and identify. But what we have here is a situation where clearly the emergency was long over when he saw his car being dropped over on the side of the tracks and all he's clearly going on about is his rims. And he's really mad and at some point he decides to make an identification that he couldn't make earlier, which means it's testimonial at that point, or he just found out the information and decides to give it to the police, which still means it's testimonial at that point. After this case was heard in district court, the Supreme Court decided a case called Michigan v. Bryant. Are you familiar with that? Yes, I certainly am. What do you make of that? I think it helps us because it focuses on the primary purpose rule, which is what we really needed all along is more and more focus on what testimonial is. And I think that Bryant makes clear that when the primary purpose of a piece of evidence or a statement, a report, whatever it is, is testimonial, then in fact the confrontation, of course, is involved. Now in Bryant it was clearly an emergency, an ongoing emergency. The guy was probably dying and they needed to know. There was obviously someone at large that had just shot him and they needed to ask those questions. And he didn't hesitate one moment. He didn't wait until after ten minutes of conversation. He just said right out, I think it was Ed, shot me. And that was a totally different situation. It wasn't like this where they have a long conversation where he gives up nothing and in the end finally says, yeah, it was Largo from Downer. Downer from Largo. I can't get the gang and the name separate. If the Court has any further questions, otherwise I'll submit them. Thank you, Ms. Marshall. Mr. Yang, back to you. Your Honor, the arguments about how Ochoa could have been fed the information by people who were standing around, that argument was made by the District Court. Made by the District Court? It was made by the District Court. And this is an example of what the District Court was trying to do. It was reading the record in one way, in its own way, and really not considering, as Richter will require, what potential theories and arguments are in support of the California Supreme Court's reading of the record. So basically, the District Court read the record as suggesting a possibility that there was a feeding of information. But when you read the record, the record doesn't suggest that at all. In fact, we would suggest a more reasonable reading was that people were standing around, they were frantic, they were talking. And he was talking with them about certain things, but he wasn't necessarily relaying things over to the dispatcher. There was no point where he said, well, this guy said that he belongs to Largo. This guy said that his nickname was Downer.  So the California Supreme Court's rejection has to be upheld because there is a reasonable reading against that argument that was supplied by the District Court. And the other arguments that were supplied by the District Court in supporting its grant of habeas corpus were of the same nature. There was a suggestion that the deputy that was handling the call could have been part of an investigation into the gangs in the area, whereas there's nothing in this record to support that. And so the California Supreme Court's reading of the record, to the contrary, would have to be upheld. And that's just two examples that I would cite. You will admit, though, that he had difficulty coming up with the name during the telephone call. He referred to the guy from Largo or something, and then it's two pages later before he identified Downer. Correct? Right. I mean, in reading the transcript, that perhaps could be an impression that could be gathered. But another reasonable interpretation of the record could be that in the franticness of the moment, in the disorderly fashion that the interview took place, it could have been that it took him some time before the name actually came to him. And, in fact, at the initial point, he didn't say some guy from Largo. He said the guy from Largo. The reading could be that he had a specific guy in mind and that the name just didn't come to him at the very beginning and that subsequently, after talking, it finally came to him. That's a reasonable reading, too. If there's a reasonable reading, Your Honor, then habeas relief cannot be granted. Thank you very much. Thank you. Ms. Marshall, thank you, too. The case just argued is submitted. We'll stand at recess for this session. Thank you. All rise. This court for this session stands adjourned.
judges: Tunheim, Silverman, Rawlinson